THE STATE v. DORRIS MORRISON, Appellant.—154 S. W. (2d) 79.

Division Two, September 25, 1941.

*Roy McKittrick,* Attorney General, and *Arthur O'Keefe,* Assistant Attorney General, for respondent.

460

██ ELLISON, J.—██ The appellant was convicted of grand larceny in the Circuit Court of Douglas County for stealing one neat cow belonging to Walter Archer, the punishment assessed being two years' imprisonment in the penitentiary. He has filed no brief in this court. All the assignments of error in his motion for new trial, except one, are directed to the proposition that the State failed to make a case for the jury. In particular he complains that the evidence was insufficient to connect him with the alleged crime. The remaining assignment charges error in the admission of incompetent evidence, but as there is no further specification pointing out the evidence objected to, this assignment is not entitled to consideration, Sec. 4125, R. S. 1939, Sec. 3735, Mo. Stat. Ann., p. 3275.

██ Mr. Archer lived less than a mile from the farm of appellant's mother, hereinafter called the Morrison farm. On Tuesday evening, December 11, 1939, he missed a black spotted Holstein cow which had been left in a lot on his farm the evening before. (As a matter of fact, December 11, 1939, was Monday, not Tuesday.) On the same day about 6 P. M. the appellant went to a truck driver for a country store at Dogwood, about seven miles from the Morrison farm, and asked him if he was Jack Swearengin. (Neither knew the other before.) Being answered in the affirmative, he said he was looking for somebody to haul some cattle to Springfield. He further stated a fellow had given him a dollar to hunt somebody who would do that, and that the parties would pay eight dollars to get the cattle delivered. It was Swearengin's recollection that appellant also remarked he had been referred to him (the witness) by Arthur Johnson. Appellant insisted the cattle must be transported that night—any time that night would be all right. Swearengin agreed to undertake the job if he could get a substitute on his own work, and asked for "a paper" naming the shipper, so he could give credit for the proceeds from the sale of the cattle at the M. F. A. stockyards in Springfield after deducting his own pay. He thought, but was not certain, the memorandum given him by appellant named someone at Willard, a postoffice in the neighboring county of Greene. Appellant told him the cattle were at the Morrison farm north of Bill Hale's store. The witness went down and got the cattle. The Morrison farm was off the State Highways, over rather rough roads.

Sheriff L. M. Barnes testified that on the same morning, December 11, another resident of the neighborhood named Hamilton reported he had a cow missing. The sheriff made a general search but failed

to find the cow. That evening some boy hurried to his office and told him some cows had just been loaded at the Morrison farm. The sheriff went to the Dogwood store and was advised two cows had been taken away. He was also informed Swearengin was trucking the cows to the M. F. A. yards at Springfield for appellant. But after a hurried trip, on his arrival at the stockyards the trucker had been gone about 20 minutes. However, he learned Swearengin had left a slip naming Dale Wade of Willard, Missouri, as the man to whom the net proceeds were to be mailed, after $8 had been deducted for the trucking charge, both Swearengin and Wade living on the same mail route. After midnight the sheriff notified Hamilton and Archer, owners ▇ of the two missing cows, and arrested the appellant.

Appellant told the sheriff that while a fellow was passing the Morrison farm with a load of cattle a flat tire developed on his truck and two cows escaped. The man asked appellant's permission to leave the two cows in the Morrison barn, and told him to hunt a truck to take them to Springfield. Appellant did not say what kind of truck it was, but did mention the trucker's name, although the sheriff did not give it in his testimony. However, he did state that appellant quoted the trucker as saying he had come from Bradleyville or Brown Branch *by way of Pansy*, and reiterated it when recalled. It was further brought out that this route was rather rough and not the road a man with a loaded truck would be likely to choose in going to Springfield, though it could be followed.

Arthur Johnson, mentioned by appellant in his talk with Swearengin as the man by whom he had been referred to Swearengin, testified that appellant approached him one evening about hauling two cows. The witness couldn't remember the day of the month or week. Appellant said a truck had broken down because of a tire blow-out and that a fellow wanted the witness to haul the cows to Springfield. Johnson couldn't do it, so both of them went to Bill Mullins. The latter also was unable to accept the job, but suggested Swearengin. Appellant mentioned the name of the man who wanted the cows hauled, but the witness couldn't remember it. He agreed that the roads from the Morrison farm to the nearest State Highway were not very good.

Appellant testified. He said his regular business was selling "Three K" products in the west part of Greene County, but on the occasion here involved he was spending the week end with his mother at the Morrison farm. He told, in greater detail, pretty much the same story that the sheriff testified he told him, but there were serious discrepancies. His version on the witness stand was that there were two men on the truck which broke down, one of them a slim fellow. It was on Monday night, not Tuesday. The men wanted to leave the two cows at his mother's farm because the tire on one of the dual back wheels was out of commission, in consequence of which the

truck would be too heavily loaded if they carried the two cows which had escaped any further. He gave the man permission to leave the two cows in the Morrison barn, and they said they would get the cows next day, Tuesday.

They did return that next evening, but said they had to go on down to Ava for a load. So they paid appellant one dollar to arrange for trucking the two cows to Springfield. He said he went to Arthur Johnson and Mullins, as Johnson had already testified, and thence at Mullins' suggestion made the arrangement with Swearengin as testified to by the latter. By that time it had got so late that he decided to remain over instead of going on to Springfield. Later that night he learned Mullins and Archer both had cows missing.

On cross-examination he said he ordinarily spent week ends with his mother, usually arriving Saturday afternoon or night and leaving Sunday afternoon or early Monday morning. On this occasion he arrived Sunday morning, first intending to return Monday, then Tuesday, and finally decided to remain until Wednesday morning, but was arrested Tuesday night. The two men on the truck said they lived "out west of here." (Ava, the county seat?) When they first appeared, Monday night, it was about 8 o'clock, and they did not say where they were taking the cattle. The truck was full of cows and calves, but still there was less than a load. The two cows belonging to Mullins and Archer were the only ones that had got out.

When the two men came back Tuesday evening appellant accidentally met them on the road about six miles north of the Morrison farm, and their truck was empty. They said they were going to Ava, but that was off the road to Ava, appellant first admitted, and thereafter twice qualified his answer by saying it was "not necessarily" the road to Ava. Then appellant quoted the men as inquiring if they could get to Ava the way they were going. He said he didn't remember whether he had told the sheriff the truck had come from Pansy (as the sheriff emphatically testified he did) which it seems would have made it head in from a different direction. The truck was an International with a green body, and the appellant said he learned the week before the trial that it belonged to Dood Hadley. He thought Hadley lived at Springfield, but did not know, and had not had a subpoena issued for him. Appellant admitted he had given Swearengin the name of someone at Willard as the owner of the two cows, and said this name was given to him by one of the two men on the truck. If it was Dale Wade as the stockyards records showed, according to the sheriff's testimony, this does not check with appellant's testimony above that the name of the trucker was Dood Hadley. And in addition to that, he declared he had only learned of Hadley's name the week before. If the man *was* Hadley, it means that Hadley gave appellant the fictitious name of Dale Wade, and

turned appellant loose to have the net proceeds from the sale of the two cows remitted to that name at Willard instead of Springfield.

Frank Williams and Preston Williams, brothers, lived on the road running north from the Morrison farm, over which appellant said the truck had come. Both testified they saw a stock truck go south on that road about 3 or 4 P. M. a day or two before they heard the Mullins and Archer cows were missing. Frank Williams added he saw the truck going up and, down the road several times before that. (In this connection remember the appellant's final testimony that when he met the two men on the truck the second day they inquired if they could get to Ava that way—thus indicating they were unfamiliar with the road.) Preston Williams thought he saw the truck go back north over the road about dark the same evening. On direct-examination Frank Williams testified the truck body was blue. On cross-examination he said it was green. It was empty. Preston Williams said the truck was green and it looked like there were two men on it.

The sheriff testified that if the truck had come through Pansy the best road would have led straight north from there and not by the Morrison farm. The State presented six witnesses living on the road by the Morrison farm and they all said they neither saw nor heard a truck passing along that road the night of the alleged larceny, except that one witness remembered a truck driven by a local merchant came to his place and returned. Several of these witnesses admitted a truck might have passed their places and without their observing it. Most of them agreed the road from Pansy to the Morrison farm was rough, as was the road north from that farm.

This was all the evidence. We think it made a case for the jury. The appellant admitted the two stolen cattle were placed in the Morrison barn under his authorization; and that he arranged for their transportation to Springfield. His real defense was that he did so innocently. It is not disputed that the cows were stolen from the owners and that one of them belonged to Mr. Archer. But there are many improbabilities and some discrepancies in appellant's testimony; and he is contradicted by the sheriff and other witnesses, directly and inferentially, on important matters. Under the State's evidence the story about the two strangers in the truck leaving the two cows at the Morrison farm may be a myth. The jury so found. Under Sec. 4456, R. S. 1939, Sec. 4064, Mo. Stat. Ann., p. 2865, it was unnecessary to prove the cow was worth $30 or more. [State v. Lawn, 80 Mo. 241, 242.] We find no error in the record proper.

The judgment is, therefore, affirmed. All concur.